Filed 12/1/21  In re L.C. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re L.C. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ERIKA R. et al.,<br><br>Defendants and Appellants. | F082703<br><br>(Super. Ct. Nos. 19CEJ300252-1, 19CEJ300252-2)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from orders of the Superior Court of Fresno County.  Elizabeth Egan, Judge.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant, Erika R.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant, Victor V.

---

[*]     Before Peña, Acting P. J., Meehan, J. and Snauffer, J.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Victor V. (father) and Erika R. (mother) appeal from the juvenile court's orders terminating their parental rights to their now five-year-old daughter, L.C., and four-year-old son, M.R. (the children). The parents contend the court erred in finding the beneficial parent-child relationship exception to adoption did not apply. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] We affirm.

## PROCEDURAL AND FACTUAL SUMMARY

*Removal*

In July 2019, the Fresno County Department of Social Services (department) received a referral alleging the parents were neglecting then two-year-old L.C. and 22-month-old M.R. The parents had a long history of domestic violence yet continued to see each other regularly despite an active protective order protecting father from mother. The protective order was set to expire in September 2021.

Mother reported mutual domestic violence that included physical, emotional, and verbal abuse in front of the children. She and father used marijuana and drank alcohol. Father reported using methamphetamine occasionally and last used methamphetamine with mother a year before. They denied having a substance abuse problem.

The family home was infested with roaches and there was mold in the bathroom. There were also exposed electrical wires and outlets. The children were released to the care of the maternal grandmother who was only able to provide temporary care.

The department filed a dependency petition, alleging the parents' substance abuse and domestic violence placed the children at a substantial risk of suffering serious

---

[1] Statutory references are to the Welfare and Institutions Code.

2.

physical harm or illness.  (§ 300, subd. (b)(1).)  The department placed the children in foster care while it searched for a suitable relative or mentor home.

The juvenile court adjudged the children dependents as alleged, ordered them removed from parental custody and ordered the parents to complete a parenting program, substance abuse, mental health and domestic violence assessments and recommended treatment and submit to random drug testing.  The court ordered supervised one-hour visits twice a week and set the six-month review hearing for March 24, 2020. On March 10, 2020, the criminal protective order was amended to allow peaceful contact.

***Reunification Period***

During the months preceding the six-month review, the parents lived together and completed a parenting program and the court-ordered assessments.  Mother was not recommended for substance abuse treatment because she reported that she was not using drugs or alcohol.  She also consistently tested negative on substance use screenings. Father was referred for outpatient substance abuse treatment and attended weekly group sessions but did not believe he had a substance abuse problem.  Mother was referred to a 26-week domestic violence program and a 52-week batterer's intervention program and was attending sessions.  Father was referred for domestic violence counseling and a 52-week child abuse program and started classes in late February 2020.  They successfully completed individual weekly mental health therapy and regularly enjoyed positive visits with the children.  They employed good parenting techniques in calming M.R. when he threw tantrums at the end of visits or attempted to hit mother or L.C.

The department advised against returning the children to parental custody but recommended the juvenile court continue reunification services to the 12-month review hearing.  Although the parents made some progress, the department wanted to continue to monitor them.  The department was concerned the parents might engage in domestic violence and expose the children to it if they were present in the home.

3.

The six-month review hearing was continued because of the COVID-19 pandemic and conducted in June 2020. The juvenile court authorized unsupervised visitation for the parents and continued reunification services to the 12-month review hearing which it set for September 1, 2020.

In its report for the 12-month review hearing, the department recommended the juvenile court terminate reunification services and set a section 366.26 hearing to consider a permanent plan of adoption. Neither parent completed domestic violence counseling and father was discharged from substance abuse treatment before completing it. They reported stress in their relationship and coped by drinking alcohol. The parents progressed to unsupervised visitation twice a week for a total of 14 hours. However, the children's caregiver reported that the parents were consistently tardy picking up and dropping off the children, returned M.R. with urine-soaked underwear, and failed to report that L.C. fell off playground equipment on one occasion. After returning from visits, the children threw tantrums and M.R. had increased incidents of soiling his pants.

The 12-month review hearing was continued and conducted as a contested hearing on October 8, 2020. The juvenile court terminated reunification services, reduced visitation to supervised visits twice a month for one hour, and set a section 366.26 hearing for January 21, 2021. In November 2020, in-person visitation was suspended due to the COVID-19 pandemic and visits were telephonic or electronic. Neither parent challenged the court's setting order by extraordinary writ petition. (Cal. Rules of Court, rules 8.450−8.452.)

The parents continued to visit the children. They told the children they loved and missed them. During video visits, they beckoned the children to the camera so they could blow kisses to each other and the children drew near. The children showed the parents their toys and the parents encouraged them to share. They also reviewed shapes and colors with the children and praised them for learning them. They occasionally directed questions to the foster mother who was there with the children.

Social worker Morrea Torres supervised visits on November 19 and December 22, 2020, using the Zoom application.  The parents sat in their car and tried to engage the children through video.  However, it was difficult for the children to remain engaged throughout the video call because of their young age and short attention span.  Father initiated games and singing and read to the children.  The children occasionally became preoccupied and had to be redirected to the video by the care provider.  There were no concerns noted during visitation.  At the conclusion of the visits, the children transitioned without distress.  They said goodbye to their parents and blew them kisses at their parents' request.

In December 2020, the children's foster parents filed a request for de facto parent status.  The children had lived with them since July 2019, and they wanted to adopt them.  They detailed the many ways in which they helped the children develop emotionally and physically.  The children were strongly attached to them and fearful of being separated from them.  L.C. stated, " 'I don't want to lose you guys' " and " 'I lost you guys for a long time.' "  Numerous friends and family members wrote letters to the juvenile court lauding the foster parents' success in bringing stability to the children's lives.

The juvenile court granted the foster parents' request for de facto parent status at the initial section 366.26 hearing on January 21, 2021.  The court set the matter as a contested hearing to be heard on March 4, 2021.  Meanwhile, the department filed its report for the section 366.26 hearing, recommending the juvenile court terminate parental rights and free the children to be adopted by their de facto parents.  The children were in good physical health with no developmental or major behavioral problems and were thus considered likely to be adopted.  They had been in the care of their de facto parents for 18 months and had developed a strong parent-child attachment to them.  L.C. said, " 'I just love them,' " referring to her foster parents and " 'Yeah, I'm really safe because I love my house.' "

*The Section 366.26 Hearing*

Torres authored the section 366.26 report and assessed the strength of the children's bond to their parents and de facto parents based on the parents' and de facto parents' ability to provide structure and nurturance and challenge and engage the children. Torres's assessment was based on one visit using the Zoom video application. She observed the parents struggled to set clear structure and identify their role as parents. Although the parents did their best to structure the video visit by focusing on the children, the children were unable to reciprocate. As for nurturing, although the parents freely expressed love for the children, they did not appear attuned to the children's emotional reactions. As an example, L.C. became frustrated and emotional while attempting an activity. Instead of consoling her, the parents encouraged her to continue trying. She finally gave up and walked over to her de facto mother for consolation. Further, the parents watched the children play instead of challenging them as they played and struggled to engage the children, who lost interest frequently and had to be redirected back to the parents by the de facto parents.

Torres concluded there was not a significant parent-child relationship between the parents and the children and the benefit of maintaining that relationship did not outweigh the benefits of adoption. The parents loved the children but were not involved in their daily routine and were more like friendly relatives than parents to them.

The parents testified at the section 366.26 hearing they regularly visited the children virtually and visits went well but it was difficult to engage them because they were toddlers and were distracted by their toys. However, when mother spoke to them, they gave her their full attention. Father believed L.C. was bonded to him because she blew him kisses and they made funny faces. He and the children stated they loved each other. Mother completed the 26-week domestic violence program and attended eight classes in the batterer's treatment program. After getting assessed for substance abuse

services, father was told he did not need them. He completed 29 of the 52 required classes for the child abuse program.

Torres supervised some of the virtual visits between mother and the children. She did not observe any nurturing connection between mother and the children and concluded they were not bonded. She did, however, observe a significant bond between the children and their de facto parents. She also concluded the children did not want to return to mother's custody based on their statements about loving their de facto parents and feeling safe with them. L.C. called mother's home the "icky house."

Mother's attorney argued the beneficial parent-child relationship exception applied because she regularly visited the children and there was a bond between them. She asked the court to select legal guardianship rather than adoption as the permanent plan. Father's attorney also argued the beneficial parent-child exception to adoption applied. He asked the court to consider father's efforts to meaningfully engage with the children given their young age and the disadvantage of having to do so virtually. He also asked the court to consider the fact that father continued to participate in services after the court ordered them terminated. He asked the court to select legal guardianship.

The juvenile court found the children were likely to be adopted and terminated parent rights. The court found the parents regularly visited the children but had not shown it would be detrimental to the children to terminate parental rights. The court noted the children were very young and had spent a significant portion of their lives with their caregivers. They looked to their caregivers for comfort and security.

## DISCUSSION

### *The Parent-child Beneficial Relationship Exception*

After a child has been adjudicated as a dependent of the juvenile court, if the juvenile court cannot safely return the child to a parent's custody within the statutory time frame, the juvenile court must set a hearing under section 366.26 to select a permanent plan. The purpose of the section 366.26 hearing is for the court "to provide

7.

stable, permanent homes for these children." (*Id.*, subd. (b); *In re Jose V.* (1996) 50 Cal.App.4th 1792, 1797.)

There are seven statutory choices for the permanency plan; the preferred choice is adoption, coupled with an order terminating parental rights. (§ 366.26, subd. (b); see *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["Legislature has thus determined that, where possible, adoption is the first choice."].) The court selects this option if it "determines … by a clear and convincing standard, that it is likely the child will be adopted." (§ 366.26, subd. (c)(1).)

Thus, at the section 366.26 hearing, "in order to terminate parental rights, the court need only make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated…. '[T]he critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued. In such cases, the decision to terminate parental rights will be relatively automatic if the minor is going to be adopted.' " (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249−250.) However, if the parent shows that termination of parental rights would be detrimental to the child for one of the six specifically enumerated reasons in the statute, the juvenile court should decline to terminate parental rights and select another permanent plan. (§ 366.26, subd. (c)(1)(B)(i)−(vi), (4)(A).) An exception to adoption provided by statute will not be found by the juvenile court unless it "finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the [six statutory] circumstances." (§ 366.26, subd. (c)(1)(B).)

The six specified circumstances in section 366.26, subdivision (c)(1)(B) are "actually, *exceptions* to the general rule that the court must choose adoption where possible." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.) They " 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.'

[Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid.*)

On appeal, both parents argue that the juvenile court erred by failing to find the parent-child beneficial relationship exception to adoption. This exception applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The exception requires a parent to establish, by a preponderance of the evidence, that he or she regularly visited the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. (*In re Caden C.* (2021) 11 Cal.5th 614, 629−630 (*Caden C.*).)

When evaluating whether the beneficial parent-child relationship exception applies, "the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633−634.)

9.

In order to establish the beneficial parent-child relationship exception applies, the parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C*., *supra*, 11 Cal.5th at pp. 636−637.)

In evaluating whether the exception applies, courts should look to several factors, including the age of the child, the amount of time the child spent in the parent's custody, the quality of interaction between parent and child, and the child's particular needs. (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citations.]" (*Caden C*., *supra*, 11 Cal.5th at p. 633.) "If severing the natural parent/child relationship would deprive the child of a substantial, positive[,] emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H*., *supra*, 27 Cal.App.4th at p. 575.) However, "[n]o matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' " (*In re K.P*. (2012) 203 Cal.App.4th 614, 621.) Even when a child loves his or her parents and desires continued contact with them, the court may nonetheless

terminate parental rights if doing so is in the child's best interests.  (§ 366.26, subd. (h)(1); *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 955.)

***The Caden C. Analysis***

In *Caden C.*, the California Supreme Court clarified how the parent-child beneficial relationship exception should be applied.  In *Caden C.*, the minor had been declared a dependent child due to the mother's substance abuse and mental health issues.  (*Caden C.*, *supra*, 11 Cal.5th at p. 626.)  At the section 366.26 hearing, Caden's mother asserted the parent-child beneficial relationship exception applied.  (*Caden C.*, at p. 627.)  The juvenile court heard testimony from numerous witnesses regarding Caden's bond with his mother and concluded she established the exception.  (*Id*. at pp. 627−628.)  The Court of Appeal reversed, taking particular issue with the juvenile court's suggestion the mother substantially complied with her case plan, maintained her sobriety and was addressing her mental health issues.  (*Id*. at p. 629.)  The Supreme Court "granted review to clarify the applicability of the [parent-child beneficial relationship] exception—in particular, whether a parent must show progress in addressing issues such as drug abuse that led to the child's dependency in order to establish the exception—and to resolve the standard of review for decisions regarding the [parent-child beneficial relationship] exception."  (*Ibid.*)

The court held that a parent's readiness to have a child returned to their custody was not relevant to the application of the parent-child beneficial relationship exception.  (*Caden C.*, *supra*, 11 Cal.5th at p. 638.)  A parent need not show that he or she is actively involved in maintaining his or her sobriety or complying substantially with their case plan and their "continued struggles with the issues leading to dependency are not a categorical bar to applying the exception."  (*Id*. at p. 637.)  The parent's continued struggles may be relevant, however, to the extent they inform the court as to whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it."  (*Id*. at p. 638.)  "The exception preserves the child's right to the relationship

11.

even when the child cannot safely live with that parent. What it does not allow is a judgment about the parent's problems to deprive a child of the chance to continue a substantial, positive relationship with the parent." (*Id*. at p. 643.)

"Accordingly, courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home.… Even where it may never make sense to permit the child to live with the parent, termination may be detrimental. [Citation.] And the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver." (*Caden C*., *supra*, 11 Cal.5th at p. 634.)

"[U]nderstanding the harm associated with severing the relationship is a subtle enterprise—sometimes depending on more than just how beneficial the relationship is. In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home. [Citation.] A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship. Sometimes, though, a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C*., *supra*, 11 Cal.5th at p. 634.)

The high court next addressed the applicable standard of review. It concluded, "We agree with the general consensus: a substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C*., *supra*, 11 Cal.5th at pp. 639−640.)

12.

"The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

The court went on to explain, however, that the juvenile court "must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. The decision is not the same as a determination whether to transfer the child from the custody of one caregiver to another, but it does require assessing what the child's life would be like in an adoptive home without the parent in his life. [Citation.] The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

***Application of the Beneficial Parent-child Relationship Exception***

As a preliminary matter, we note the parents do not challenge the juvenile court's finding that the children are adoptable. Nor is it disputed the parents met the first prong of the beneficial parent-child relationship exception—i.e., maintaining regular contact and visitation with the children. Rather, the focus of this appeal is whether the court erred in finding the children would not benefit from continuing their relationship with the

parents. The parents contend it was error because the court did not fully assess their bond with the children, especially in light of the limitations inherent in video visits. Instead, they assert, the court immediately weighed the benefits of adoption after finding the parents regularly visited the children.

In ruling, the juvenile court stated,

"The evidence has shown, and the Department acknowledges, the parents have regularly visited with the children, and it cannot be said that it does not confer some benefit to the children. [T]he law is clear, however, that some benefit of the natural parent/child relationship in a tenuous placement is not sufficient grounds to depart from the statutory preference of adoption. [¶] The Court weighed whether the parents' relationship with the children promotes their wellbeing to such a degree as to outweigh the wellbeing the children would gain in a permanent home with adoptive parents. [¶] The children are very young and have spent a significant portion of their lives with their caregivers. They look to their caregivers to meet their daily needs. They look to them for comfort and security. [¶] The parents must show more than frequent and loving contact are pleasant visits to meet the exception, and they have not shown that the children will suffer the detriment if their rights as parents are terminated. [¶] The court finds the best interest of the children are served by a permanent plan of adoption."

The record is unclear as to the juvenile court's finding on the second element, whether "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The court did not make any express findings on the record that a beneficial parental relationship existed between the parents and the children.

Nevertheless, it appears the juvenile court impliedly found the parents did not have a beneficial relationship with the children because it reached the third element of the parent-child beneficial relationship exception—whether "termination would be detrimental to the child due to" the beneficial parental relationship. (§ 366.26, subd. (c)(1)(B); see *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1099 [implying juvenile court's findings on the parental-benefit exception].) The court stated: "[The parents]

14.

have not shown that the children will suffer the detriment if their rights as parents are terminated."

Further substantial evidence supports the juvenile court's finding a beneficial parent-child relationship did not exist. (See *In re S.G.* (2003) 112 Cal.App.4th 1254, 1260 ["we will infer a necessary finding provided the implicit finding is supported by substantial evidence."].) By the time of the section 366.26 hearing, the children had lived out of their parents' custody for approximately 19 months. That accounts for about one-third of L.C.'s life and nearly one-half of M.R.'s life. In that time, they bonded with their caregivers and came to rely on them to meet their daily needs. Simultaneously, the parents' contact was limited to visitation, which was for the most part supervised. As a result, the bond they shared with the children prior to their removal took on a quality of a friendly relative rather than a parent.

In short, the record supports a finding that the children and the parents lacked a "substantial, positive, [and] emotional attachment." The parents, therefore, failed to establish the second prong of the beneficial parent-child relationship exception.

Further, the parents failed to show that the benefits of maintaining their relationship with the children outweighed the benefits of being adopted by their de facto parents. By all accounts, the children separated easily from their parents at the end of visits and were happy to transition into the exclusive care of their de facto parents. On the other hand, at least L.C. expressed concern about being separated from her de facto mother.

Father, nevertheless, contends the juvenile court considered improper factors in concluding he and mother did not have a "substantial, positive, emotional attachment" with the children. He cites *In re B.D.* (2021) 66 Cal.App.5th 1218, 1225 (*B.D.*), which is factually distinguishable.

In *B.D.*, the parents appealed from the juvenile court's orders terminating their parental rights to their two children, challenging the court's finding that the beneficial

parent-child relationship exception did not apply. (*B.D.*, *supra*, 66 Cal.App.5th at p. 1222.) The appellate court filed an opinion affirming the orders. However, before the opinion was final, the mother filed a petition for rehearing arguing the decision in *Caden C.* supported a conclusion the juvenile court erred. The court granted rehearing, vacated its initial opinion, and reversed for the juvenile court to reexamine the record in light of *Caden C.* (*B.D.*, at p. 1222.)

The minors in *B.D.* were removed because of their parents' physically violent relationship and use of dangerous drugs. (*B.D.*, *supra*, 66 Cal.App.5th at p. 1223.) The juvenile court terminated reunification services and parental rights, finding the parents did not fulfill a parental role. (*Id.* at p. 1224.) The appellate court reversed the orders terminating parental rights, concluding the juvenile court considered improper factors in deciding whether the parents had proven they had a " 'substantial positive, emotional attachment' " with their children. (*Id.* at p. 1229.) Specifically, the juvenile court "relied heavily, if not exclusively, on the fact that the parents had not completed their reunification plans and were unable to care for the children based on their long term and continued substance abuse. The juvenile court, however, did not examine how the parents' continued substance abuse impacted the nature of the parent-child relationship." (*Id.* at p. 1228.)

Further, the court was not convinced the juvenile court examined the nature of the parent-child relationship before the dependency proceeding or the visits and contact between the parents and children during the dependency proceeding to evaluate whether a significant, positive, emotional attachment existed between the parents and children. The court stated, "This type of evaluation is crucial to the third step of the analysis, weighing the harm of severing the natural parent-child relationship to the benefits of a new adoptive home." (*B.D.*, *supra*, 66 Cal.App.5th at p. 1223.) The court continued, a " 'significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.'

16.

[Citation.] A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability. Finally, an emotional attachment is one where the child views the parent as more than a mere friend or playmate and who's interactions with the parent were not ambivalent, detached, or indifferent." (*Id*. at p. 1230.) Moreover, the *B.D.* court found evidence on the record to suggest the parents had a beneficial relationship with their children. (*Id*. at p. 1229.)

*B.D.* is distinguishable because the juvenile court in this case did not consider whether the parents complied with their services plan in assessing the beneficial nature of their relations with the children as proscribed in *Caden C*. Further, while the juvenile court did not expressly assess the parents' relationship with the children before and during the dependency, there is no evidence to support a finding the children had the degree of emotional attachment that would signify a beneficial relationship as envisioned by the statute. They clearly enjoyed their contact with their parents but had at best a relationship more akin to a friend or playmate.

We find no error in the juvenile court's determination the parent-child beneficial relationship exception did not apply.

**DISPOSITION**

The court's orders terminating father and mother's parental rights and setting adoption as the permanent plan are affirmed.

17.